**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

_____

**VAMPIRE FAMILY BRANDS, LLC**
          Plaintiff,

                              Case No. 8:23-cv-01014-TPB-TGW

v.

**DRACULA'S LEGACY, LLC,**
**ELENA RAMONA NEAMTU, and**
**VASILE RELU NEAMTU,**
          Defendants.
_____/

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff's Motion only highlights the factual disputes that must be resolved, demonstrating why Plaintiff is not entitled to summary judgement. Plaintiff misleads the USPTO when it filed declarations stating that it was the only entity that could use the purported marks VAMPIRE and DRACULA. Michael Machat made those statements on his own behalf individually, but he has never offered any of the goods and services he claimed to be the only one lawfully able to do so. Instead, there is a cornucopia of different entities that were apparently using these purported marks commercially, some owned by Machat, others not. And notwithstanding his attempt to gain the protections associated with the use of corporate vehicles, he failed to comply with the requirements needed for each such purported owner or user to be legally engaged in commerce for the claimed goods. So, either he was unlawfully engaged in such commerce, or different entities were

using the supposed marks freely.  Either way, he can't have registrations with these misstatements.

As to the affirmative defenses, Plaintiff is simply wrong.  Plaintiff clearly sold its rights to the accused wines to the importer and distributor and can't go downstream looking at their customer for more revenue to support its litigation business model.  As to the functionality of Plaintiff's supposed marks, it is facially evident that Plaintiff does not exclusively own Dracula and vampires and Defendants are free to use those concepts without fear of litigation or liability to an overreaching Plaintiff.  Plaintiff even surprisingly admits as much in its moribund motion.  Even were Plaintiff to maintain some of its registrations, whatever trademark rights it has are extraordinarily narrow because the test remains one of likely consumer confusion.  Unlike the brands Plaintiff tries to stand in the shadows of, the consuming public has no idea who Plaintiff is and instead associates Dracula and vampires with the historical significance Defendants build their legacy on.  Plaintiff's motion must be denied.

## I.   BACKGROUND

Plaintiff has a trademark registration on the word "Dracula" associated with wine, and the word "vampire" associated with restaurant and bars.  Defendants operate a wine bar called DRACULA'S LEGACY.  Defendants do not operate any bar or restaurant called "vampire," so Plaintiff knows it has no claim against the bar's name.  Instead, Plaintiff tries to paint its rights broadly enough to be able to pursue a claim against the bar name, even though Plaintiff itself now admits in its motion that such claim is an overreach.

For a brief period of time, Defendants offered a house wine at their bar called Dracula's Legacy.  Plaintiff had been aware of that for years prior to filing suit.  Eventually, Plaintiff demanded Defendants stop, and they did as fighting the wine was less expensive than fighting the litigation.  Plaintiff even worked out deals with the winery and importer to pay for the ~3,000 bottles of wine, but Plaintiff thinks those sales don't exhaust Plaintiff's claim.  Plaintiff is mistaken.

Plaintiff is really just a single person, namely Michael Machat, a trademark lawyer from Beverly Hills.  He has represented himself throughout this litigation and represents himself in all interactions with the USPTO to gather up his various trademark registrations.  Machat has filed numerous lawsuits (over at least 23 district court cases across his various companies) seeking to expand the scope of his limited rights and has entered into numerous nuisance value settlement agreements (over at least 15 settlement agreements) with people who have engaged in de minimis uses of vampires and Dracula.  Here, he asserted his purported rights against an immigrant family from Romania who not only built their business' brand around their legacy, but also built their entire heritage around Dracula and his valuable history to Romanian people.  So, unlike the easy cases that have not challenged Plaintiff's purported rights, Defendants are committed to doing what they're entitled to do – building their American life and business around their Romanian heritage, including their hero Dracula.

Dracula's Legacy is a small local business currently operating Dracula-themed wine bars in St. Petersburg and Tampa.  Elena Ramona Neamtu (wife) and Vasile Relu Neamtu (husband) own and operate the bars. The bars pay homage to

their Romanian heritage, and in particular, the legacy of the Romanian hero Vlad the Impaler/Dracula. To follow the theme of Dracula and vampires that originated in Transylvania, Romania, Dracula's Legacy stylized its wine bar with vampire aesthetics with various references to "Vlad the Impaler" and "Dracula." Dracula's Legacy has built a successful small business that attracts patrons from all over who are intrigued by the bar's unique theme and the homage paid to the legacy of Dracula.

Years before this lawsuit, Plaintiff learned that Defendants' wine bar was called Dracula's Legacy. Plaintiff did not object to this usage, and instead sought to sell wine products to Defendants—some of which Defendants did offer for sale. It wasn't until Defendants sold their own house wine that Plaintiff began demanding that Defendants either enter into a license with Plaintiff or change the name of their bar and stop the sale of wine called Dracula's Legacy.

**Material Facts Requiring Trial**

Instead of submitting a statement of material facts with pinpoint citations, Plaintiff drafted a narrative which appears to be Machat's autobiography as to his perspective of developing his wines.  Notably, we use the term "his wines" very loosely, because neither Plaintiff nor Machat are winemakers.  They buy wine and put stickers on bottles and sell that wine as though it came from their "vineyard." But their "vineyard" has always been just an office park in Southern California (and sometimes, not even that, but simply Machat's law office).   Defendants disagree with Plaintiff's characterization of its history but focus on the facts the Court needs to resolve the motion.

Concerning the counterclaims, Plaintiff misled the USPTO as to who was using what mark and when, and who was entitled to use it. Plaintiff did not tell the USPTO that numerous companies (some owned by Machat, some not) used the mark freely, and did not tell the USPTO that none had any license to engage in restaurant services. Nor did Plaintiff tell the USPTO that the use of vampires and Dracula in the hospitality space is rampant and Plaintiff certainly can't claim to be the only entity permitted to do so.

The fact finder must weigh whether Machat's statements to the USPTO were misrepresentations that mislead the USPTO into allowing or maintaining his trademark registrations. The fact finder must determine what we all already know – that nobody associates Dracula or vampires with Plaintiff, and instead immediately recognizes Defendants' use of those characters with their historical significance. Defendants offer the following Statement of Material Facts ("SMF"):

1) Michael Machat has never had a license to sell food in California. *See* **Exhibit A and C.** A restaurant license in California requires a class 41 license "On-Sale Beer & Wine – Eating Place" (or any other "on-sale" licensee). Machat has never had any such license. Ironically, another Vampire named entity in California currently does. *See* **Exhibit B** (showing Vampire Cosmetics Inc. with such a class 41 license). Instead, Machat and most of the various entities he has tried to shuffle rights around to have only ever had class 9, 17, and 20 licenses. *See* **Exhibits C, C-1, C-2.** But those licenses are limited only to importing or wholesaling beer and wine. None of those entities have ever legally been able to sell food, or even to operate a wine bar.

2)    On April 20, 2011, Machat declared under penalty of perjury that he personally was lawfully using the VAMPIRE mark in commerce in connection with restaurant and bar services.  *See* **Exhibit E**. On April 20, 2011, Machat had no license from California to operate either a restaurant or a bar or engage in on-premises wine sales.  And none of the entities he has identified did either.

3)    He created another company years later, BlueBloods, LLC so that he could have his minor son have an interest in the tasting room.  And years after he filed that declaration, he sought to have BlueBloods acquire a license that would actually permit someone to operate a bar.  *See* **Exhibit D**, Machat Dep. Tr. at 113:18-114:2. But Machat did not control BlueBloods, a trust did.  *Id*. at 119:17-25.

4)    Plaintiff was unable to provide any written license of any trademark rights to or from BlueBloods.  *See* Machat Dep. Tr. at 118:12-15.

5)    Machat closed the Vampire Lounge that was operating in Beverly Hills, California, and believes that may have been in 2017.  *See* Machat Dep. Tr. at 112:6. When he closed the lounge, he had no intention to open any restaurant using the name Vampire.  Instead, he closed it because it wasn't making any money, and was just taking up time.  *Id*. at 112:19-24.  Years later, his friend decided she wanted to open up a café in New Orleans.  *See id*. at 191:10-11.  This was his friend's idea, not his, further confirming he had no plans himself to use the Vampire mark in connection with restaurants or bars.  *See id*. at 190:18-191:11. He did not enter into a license with her until 2022.  *See* **Exhibit F**.

6)    On May 13, 2021, Machat filed another declaration on behalf of Plaintiff under penalty of perjury with the USPTO, declaring that Plaintiff was

lawfully using the Vampire mark in commerce.  *See* **Exhibit E-1**.  That statement was false.

7)    On December 8, 2020, third party CUZINS4, LLC obtained a Louisiana trademark registration for the mark "THE NEW ORLEANS VAMPIRE CAFÉ."  *See* **Exhibit G.**  At no point in time has Plaintiff or Machat owned or controlled Cuzins4.

8)    On March 1, 2022, Plaintiff entered into a purported "Trademark License Agreement" with Cuzins, LLC.  *See* **Exhibit H**.  That agreement confirms that Plaintiff does not exclusively control its purported rights in Vampire.  It also confirms that the statement Machat made to the USPTO on May 13, 2021 was false.

9)    U.S. Trademark Registration No. 3,319,536 for the mark "DRACULA" in connection with "wine" issued in the individual name of Michael Machat on Oct. 23, 2007.  *See* **Exhibit I**.  U.S. Trademark Registration No. 3,978,444 for the mark "VAMPIRE" in connection with "restaurant; restaurant and bar services" issued in the individual name of Michael Machat on June 14, 2011.  *See* **Exhibit J**.

10)    Numerous third parties use vampire and Dracula name and themes in their marketing[1].  *See e.g.* **Exhibits K-R**.   Numerous third parties have Florida fictitious name registrations for vampire-related names.  *See* **Exhibit S**.  Included among them is a company that has the fictitious name VAMPIRE SPIRITS.  *See id.*

11)    The USPTO currently lists 732 live trademark applications or registrations including the word "vampire."  *See* **Exhibit T**.  For example, U.S.

---

[1] Defendants hesitantly include each of these as Defendants have no interest in exposing any of these other parties to Plaintiff's overreaching litigation and enforcement efforts.

Trademark Registration No, 6,154,351 is for the mark "VAMPIRE FRIENDLY" in connection with *inter alia* "Providing nightlife information through an online website, namely, providing information about bars and restaurants." *See* **Exhibit U**.

12)    The USPTO currently lists 781 live trademark applications or registrations including the word "dracula." *See* **Exhibit V**.  For example, U.S. Trademark Registration No. 5,980,794 is for the mark "DRACULA LAND" in connection with *inter alia* "bar services;" and "restaurant services." *See* **Exhibit W**. As another example, U.S. Trademark Registration No. 6,584,126 is for the mark "THE DARK COUNT OF TRANSYLVANIA" in connection with wine, and includes a specimen, which shows a Dracula character in connection with wine. *See* **Exhibit X; Exhibit Y**.

13)    The Dracula registration was assigned from Machat to Vampire Brands, LLC on August 12, 2011.  *See* **Exhibit Z**.  Vampire Brands then assigned the registration to Machat's law firm, namely "Machat & Associates, P.C." on August 12, 2012.  *See* **Exhibit AA.**  Machat's law firm has never made or sold wine or operated any restaurants or bars.  Machat's law firm then assigned the registration to Plaintiff on June 1, 2019.  *See* **Exhibit BB**.  That same day, Machat assigned the vampire registration to Plaintiff as well.  *See* **Exhibit CC**.

## III.    <u>ARGUMENT</u>

The Court is familiar with the summary judgment standards.  "At any time, a party may petition to cancel a registered mark on the ground that the registration was procured by fraud, even if that mark has become incontestable." *Sovereign Mil.*

*Hosp. Order of St. John v. Florida Priory of the Knights Hosp.*, 702 F.3d 1279, 1289 (11th Cir. 2012). "An applicant commits fraud when he 'knowingly makes false, material representations of fact in connection with an application for a registered mark.'" *Id.* (quoting *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008)).

## A.    Factual Issues Preclude Summary Judgment on the Counterclaims

Concerning the vampire registration, the jury must decide if: (1) Machat's statements that he was using the mark while he was not lawfully permitted to do so, was fraudulent; and (2) even if he or Plaintiff was deemed to be using the mark in connection with "restaurant and bars" at the Vampire Lounge, did they abandon those rights when they closed with no intention to open again.  Factual questions prohibit resolving those issues on summary judgment.  Concerning both the vampire registration and the Dracula registration, the jury must also decide if Machat's statements that "no other person, firm, corporation, or association has the right to use the mark in commerce…", notwithstanding extensive use of vampire and Dracula names and themes throughout the hospitality space, and notwithstanding Plaintiff's new recognition that anyone can "deck their bars out with vampire or Dracula memorabilia," were fraudulent.  Plaintiff has known this "new" fact all along, but used his experience as a trademark attorney to check a box on a form and trick the USPTO into giving him a piece of paper that he thinks gives him the right to stop others from doing precisely that.

### 1.    Plaintiff Did Not Lawfully Offer "Restaurant" Services in Connection with the VAMPIRE Mark

Machat filed the vampire application in 2008, claiming he personally intended to use the mark in connection with "restaurant; restaurant and bar services; restaurant and hotel services."  After the application was abandoned 3 times, Machat eventually told the USPTO under penalty of perjury that he was engaged in lawful commerce providing "restaurant; restaurant and bar services":

> The mark was first used by the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as 04/19/2011, and first used in commerce at least as early as 04/19/2011, and is now in use in such commerce. The applicant is submitting one specimen for the class showing the mark as used in commerce on or in connection with any item in the class, consisting of a(n) a picture of the window and door of the Vampire Lounge and Tasting Room -- a bar and restaurant.

*See* **Exhibit E**.  That statement was false because neither Machat, nor any of the various companies he created, was ever lawfully permitted to run a bar or restaurant.  The Vampire Lounge and Tasting Room was not a restaurant in April, 2011.  *See* **Exhibit D.**  Machat Dep. Tr. at 213:11-13 ("Run the Vampire Lounge & Tasting Room, though it's not a full-fledged restaurant….").  The USPTO relied on his misrepresentation and issued the trademark registration. *See* **Exhibit E-2**.

Unlawful use of a mark can be used to invalidate the mark in litigation[2].  *See FN Herstal SA v. Clyde Armory, Inc.*, 838 F.3d 1071, 1086–87 (11th Cir. 2016).  A use is unlawful, and thus precludes trademark registration, if it would violate a statute governing sales of such goods or services. *Id*. at 1087.  Operating a restaurant that

---

[2] The Court noted that the Eleventh Circuit has not yet adopted this defense, and did not address the issue in the *FN Herstal* decision because of the factual record there.  *See VPR Brands, LP v. Shenzhen Weiboli Tech. Co.*, 2024 WL 3811774, at *6 (Fed. Cir. Aug. 14, 2024)("Rather, the Eleventh Circuit left open the question of whether to adopt the doctrine under circumstances that warrant further analysis than what the facts in *FN Herstal* called for.")

sells wine in California without the proper license is a per se violation of California law, and thus unlawful.  *See* California Business and Professions Code §23300.

Neither Machat, nor any of his entities, were authorized to operate a restaurant and bar in April, 2011 when he told the USPTO he was.  *See* SMF at ¶ 2. Unsurprisingly, Plaintiff's own evidence demonstrates he was not operating a restaurant.  *See e.g.* [Dkt. 90-23] at 105 ("The staff is very friendly and the wine is very good.  They allow you to order food from outside.").  A "tasting room" is not a restaurant or bar.

There is also no question that the Vampire Lounge closed in approximately 2017.  *See* Machat Dep. Tr. at 112:6. And it closed because it wasn't making any money.  *See* Machat Dep. Tr. at 112:19-24.  A mark is abandoned:

> When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127.  There is no question that Plaintiff closed the Vampire Lounge. There is no question that Plaintiff never opened another one.  Plaintiff seeks to avoid abandonment by arguing that it took a licensee in 2022, namely The New Orleans Vampire Café.  But restarting up a new usage does not un-abandon a previously abandoned one.  When Plaintiff closed its nonprofitable Vampire Lounge, it had no intention to continue using the mark Vampire in connection with restaurants and bars.  This can be inferred from the circumstances as Plaintiff has produced no evidence of any attempts to re-open any restaurants or bars.

When Plaintiff eventually went to try and license it again later, it was not Plaintiff's idea to do so. Instead, Plaintiff's friend wanted to expand her speakeasy into a restaurant or bar, and Plaintiff saw that as a way to resurrect his dead vampire rights. *See* Machat Dep. Tr. at 190:18-191:21; 193:2-9. And this purported licensee has its own rights to its usage of the word vampire. *See* SMF at ¶ 7. To the extent Plaintiff disagrees with any of this factual presentation, such a disagreement only demonstrates the impropriety of Plaintiff's motion, as the jury will need to determine whether Plaintiff abandoned any purported rights it claims to have.

**2.    Machat Co-Mingles Funds Between Himself and His Companies**

Plaintiff also admits to ignoring the various corporate fictions he creates and co-mingling funds and use of the asserted marks between himself and his various companies—despite telling the USPTO that only a single entity was using, and had the right to use, each mark. *See* Machat Dep. Tr. at 155:24-156:8. Machat has admitted to exchanging money and supposed usage of the marks between his various companies and himself personally. Machat even assigned the purported trademark rights to his law firm, even though his firm was never in the wine or bar business. *See* SMF at ¶ 13. He also told the USPTO there were no other entities using the purported mark, but admits that BlueBlood trust (an entity he does not control) also used the mark. *See* Machat Dep. Tr. at 116:8-13; 119:20-25.

The certificate of registration for the vampire mark was issued to "Michael Machat" on June 14, 2014. *See* **Exhibit J**. The rights to the registration were then assigned to Plaintiff in June 2019. But Plaintiff's motion explains that TI Beverage Group (TIBEV) opened the Vampire Lounge in 2011 until ownership changed to

Bluebloods, LLC. *See* [Dkt. 89] at 12-13.  Thus, at the time Machat submitted his sworn statements to the USPTO and obtained the registration for the VAMPIRE mark, he did not disclose to the USPTO that it was actually TIBEV, not Machat personally, who was attempting to use the mark in commerce by operating the Vampire Lounge.  And it's clear that TIBEV never had any restaurant or bar license either.   Nor did he disclose usage by multiple parties when renewing the VAMPIRE registration.

A genuine dispute exists as to whether Machat declared to the USPTO that only Plaintiff had the right to use the marks in commerce while knowingly allowing his other companies, and himself personally, to also use the Asserted Marks free of any license agreement or control by Plaintiff.[3] *See Sovereign Mil.* 702 F.3d at 1290 ("The type of fraud allegation that has given rise to the largest number of cases is the charge that registrant signed the application oath knowing of use of the mark by others…..") (Quoting 6 McCarthy on Trademarks § 31:75 (4th ed. 2012).

### 3.   Machat Told The USPTO He was the Only One Permitted to Use the words Vampire or Dracula; He Now Concedes This Is False

In both registrations, Machat testified, under penalty of perjury, that he believed himself personally to be the only one that could use Vampire or Dracula and "no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of

---

[3] Plaintiff has not produced any license agreement in discovery showing that the Asserted Marks have been licensed to Machat's other companies.

such other person, to cause confusion, or to cause mistake, or to deceive."  *See* **Exhibit DD** at 186; **Exhibit EE** at pg. 152.  But when Machat made these statements, he knew full-well that Dracula and vampire names and themes are used extensively in the hospitality space.  *See* SMF at ¶¶ 11-13.

In 2005, he lost a domain name dispute he had brought trying to have the domains vampiredrinks.com, vampirevodka.com, vampyrevodka.com, and vampes.com cancelled.  The tribunal there held that the domain name owner:

> has provided credible and convincing evidence, which Complainant [Machat] has neither denied nor attempted to refute, showing that Respondent used the VAMPIRE mark in *bona fide* sales of branded wines back as early as the 1980's and continued to do so with respect to wine and other beverages.

*See* **Exhibit FF** at 15.

Plaintiff's motion appears to be the final nail in its own coffin.  Notwithstanding its years of overbroad enforcement campaigns against anyone that tries to use Dracula or vampires in the hospitality space, and notwithstanding 3-separate complaints filed against Defendants in this very case where he pleads (under the Rule 11 standard) that Defendants have purportedly infringed his supposed rights because their bars:

- use the word 'vampire' throughout their wine bar, including on a street sign that says "VAMPIRE^AVN"
- include signage saying "Warning!, Property Protected by VAMPIRES"
- include signage that says "BEWARE OF VAMIPRES"; and
- "the wine bar is decked out with vampire memorabilia … and pictures of Dracula from vampire movies."

*See e.g.* Amended Complaint [Dkt. 22] at ¶¶ 40-42.  Through its Motion – another document signed by Machat under the Rule 11 standard – Machat now states that

he has no claim to such overbroad rights: "VFB has no qualms if Defendants deck their bars out with vampire or Dracula memorabilia." *See* Motion, [Dkt. 89] at 24. Machat misled the USPTO when he said he was the only one that could do so. He then spent years using the piece of paper he got from the USPTO to harass small businesses into nuisance settlements to try to claim the entirety of Dracula and vampires for himself. The jury will need to look at Machat's comments made on the eve of trial distancing himself from his years of overbroad enforcement to determine whether he duped the USPTO into granting him improper trademark registrations.

**B.     Summary Judgment on the Affirmative Defenses Must Be Denied**

**1.     Affirmative Defenses (1) and (2)**

These defenses survive summary judgment for similar reasons to the cancellation counterclaims. Plaintiff mislead the USPTO in obtaining its rights; its attempt to plead claims based on those improperly obtained and maintained rights must fail. Plaintiff has no enforceable rights in the word vampire in connection with restaurants and bars.

Plaintiff also has no rights to the word "Dracula" in connection with restaurants or bars. To the extent Plaintiff is seeking to expand whatever rights it may have in association with its sales of Dracula-named wine, such an attempted broadening of Plaintiff's rights would not valid or enforceable.

**2.     Affirmative Defenses (3) and (4)**

Plaintiff's fraudulent statements led to the issuance of the registrations for the Asserted Marks and affirmative defenses (3) and (4) are proper defenses against Plaintiff's unclean hands.

### 3.    Affirmative Defense (5)

There is no dispute that the Vampire Lounge (that wasn't a restaurant) closed around 2017.  And there is no evidence Plaintiff ever intended to resume any such usage.  Instead, his friend came to him years later saying she wanted to run a restaurant, and she herself obtained a state trademark registration for her usage.  Years after that, Machat entered into a license to try to claim that usage for himself, but that does not un-abandon his prior "usage."   At best, it remains disputed whether Plaintiff abandoned its purported use of the vampire mark by closing the Vampire Lounge.

### 4.    Affirmative Defense (7) – First Sale

> We recognize the general rule that a trademark owner's authorized initial sale of its product exhausts the trademark owner's right to maintain control over who thereafter resells the product; subsequent sales of the product by others do not constitute infringement even though such sales are not authorized by the trademark owner.

*Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1298–99 (11th Cir. 2001). Plaintiff entered into agreements with the winery and importer.  *See* **Exhibits GG and HH.** Through those agreements, Plaintiff confirmed that the ~3,000 bottles of accused wine were now authorized, notwithstanding the parties' dispute over the trademark rights.  Both the winery and importer make clear that neither agrees with Plaintiff's infringement allegations, and both settled for nominal payments.

And in the case of the winery, Plaintiff further agreed to end its challenge of the winery's Dracula-themed wine pictured below (**Exhibit Y**):



Plaintiff's agreement with the winery explicitly states that the winery is paying a particular price for each bottle of wine.  *See* **Exhibit HH** at pg. 5.  Thus, the winery paid for each bottle of wine Plaintiff complains of without acknowledging any alleged infringement.  *Id.* at 2.1.  And Plaintiff agreed to withdraw its attempt to cancel their trademark registration for its Dracula-themed wine. *Id*. at pg. 7 Plaintiff exhausted any trademark rights it had in the bottles of wine and cannot go further downstream for additional payments.

### 5.    Affirmative Defense (8) – Aesthetic Functionality

Trademark law exists to protect source identification, not functionality. Functionality is an absolute bar to trademark protection.  *See e.g.* 15 U.S.C. § 1052(e)(5) ("No trademark … shall be refused registration unless it … comprises any matter that, as a whole, is functional."); § 1065(3) (cancellation is appropriate "[a]t any time if the registered mark … is functional.").  "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Dippin' Dots, Inc. v. Frosty Bites*

*Distribution, LLC*, 369 F.3d 1197, 1202–03 (11th Cir. 2004). This functionality doctrine is fatal to Plaintiff's enforcement efforts (as Plaintiff now surprisingly concedes). Plaintiff is seeking to stop any usages of the concepts of vampires and Dracula in connection with wine and wine bar services. But the question under the functionality doctrine is: are there non-reputation-related disadvantages to Plaintiff's enforcement campaign? The answer is a clear yes. Defendants do not use the concepts of vampires or Dracula to draw any association with Plaintiff whatsoever. Instead, they build on these public-domain concepts for what they are – lores and stories of Dracula and vampires on which Defendants build their business legacy through their wine bar with the same name and themes.

Plaintiff tries to distance itself from its own allegations. Plaintiff pretends this case is just about the name printed on the door of Defendants' bar. Plaintiff ignores that Defendants use a stylized version of their logo:



Plaintiff states in its motion that "VFB has no qualms if Defendants deck their bars out with vampire or Dracula memorabilia" but pleads its claim (even in its next amended complaint filed *after* its motion) that "the wine bar is decked out with vampire memorabilia…and pictures of Dracula from vampire movies." *Compare* Motion [Dkt. 89] at 24 *with* Proposed SAC [Dkt. 92-1] at ¶ 37. Plaintiff's recognition that it can't stop Defendants (or anyone) from "deck[ing] their bars out with

vampire or Dracula memorabilia" is simply a recognition not just of the weakness of Plaintiff's purported marks, but that those concepts are absolutely functional.

### 6.      Affirmative Defense (9) – Fair Use

It is always a defense to infringement that the asserted use of the mark at issue was used fairly.  *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004); *see also* 15 U.S.C. § 1064(b)(4).  Here, Defendants have not used either vampire or Dracula individually as a trademark.  Concerning vampire, Plaintiff does not even appear to have any viable claim, particularly in light of its statement in its motion that it has "no qualms" with the use of such memorabilia.

Concerning Dracula, Plaintiff has no trademark rights for the word Dracula in connection with wine bars.  But Plaintiff thinks its word mark for the word "Dracula" in connection with wine gives it some foothold.  Defendants are not using "Dracula" in their bar's name to identify Plaintiff, but instead have named their bar "Dracula**'s Legacy**" – a different phrase altogether.  Defendants use this name because the wine bar refers to the legacy of Dracula.  And they chose this name not just as a play on the historical figure's legacy, but on their own legacy. *See* **Exhibit II,** Neamtu Declaration at ¶ 3. Defendants designed their logo to mimic an image of what we all think of as Dracula, but using their own son as an inspiration for this version of the Dracula.  *Id*. at ¶ 10.  Thus, their Romanian heritage of growing up (for generations) with Dracula as a hero, who they could then build their American dream on sharing this legacy with their new country.

Defendants referring to the logo as the "Dracula" logo simply demonstrates the historical figure on which Defendants have built their legacy.  Plaintiff has

recognized the weakness of its Dracula rights in connection with wine by expressly allowing yet another winery to use Dracula imagery as part of its source identification.  *See* **Exhibit Y.**  Just as the use of Dracula's imagery with Budureasca's wine is a fair use (as Plaintiff's expressly concedes in the agreement with the winery), so too is Defendants'.

Nor does Defendants' menu help Plaintiff; quite the opposite.  Defendants' menu clearly demonstrates the playfulness of referring to various items as "Dracula's favorites"—meaning, the items that Dracula himself would consider his favorite items if he was there to enjoy them. *See* **Exhibit II**, Neamtu Declaration at ¶ 12.

Using vampires is fair since the word is merely a reference to the fictional vampires. By having signage and memorabilia drawing patrons' attention to vampires, it further enhances the overall patron experience and immersion within the wine bar. *See* **Exhibit II**, Neamtu Declaration at ¶ 5. Plaintiff appears to recognize this as it has chosen not to present any argument as to why the fair use defense is not applicable to its "VAMPIRE" mark.

## V.   <u>CONCLUSION</u>

The Court must deny Plaintiff's Motion.  Fact issues preclude Plaintiff's motion, and the fact finder should decide if he mislead the USPTO, or if Defendants' affirmative defenses are satisfied.  Plaintiff's credibility is a clear issue for jury resolution.  Summary judgment must be denied.

Date: November 5, 2024                    */s/ Woodrow H. Pollack*
                                          Woodrow H. Pollack

Lead Counsel
Florida Bar No. 26802
Brian Paul
Florida Bar No. 1018684
**SHUTTS & BOWEN, LLP**
4301 W Boy Scout Blvd
Suite 300
Tampa, FL 33607
(813) 463-4894
wpollack@shutts.com
 bpaul@shutts.com

*Counsel for Dracula Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 5, 2024 a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.

*/s/ Woodrow H. Pollack*
Woodrow H. Pollack