UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

VAMPIRE FAMILY BRANDS, LLC,

    Plaintiff,

v.                                              Case No. 8:23-cv-1014-TPB-TGW

DRACULA'S LEGACY, LLC,
et al.,

    Defendants.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART VAMPIRE FAMILY BRANDS, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter is before the Court on "Vampire Family Brands, LLC's Motion for Partial Summary Judgment and Incorporated Memorandum of Law," filed on October 15, 2024. (Doc. 89). Defendants Dracula's Legacy, LLC, Elena Neamtu, and Vasile Neamtu filed a response in opposition on November 5, 2024. (Doc. 93). Plaintiff filed a reply on November 19, 2024. (Doc. 96). Based on the motion, response, reply, court file, and record, the court finds as follows.

## Background

This is a trademark dispute. Plaintiff Vampire Family Brands, LLC alleges that it owns the trademarks "Dracula" with respect to wine and food, "Vampire" with respect to wine and restaurant and bar services, and other related marks. Plaintiff alleges that it sells its Dracula and Vampire wines nationally and that

they are available in retail stores, bars, and restaurants. TI Beverage Group – another entity which, like Plaintiff, is owned by Michael Machat, Plaintiff's counsel in this case[1] – opened the Vampire Lounge & Tasting Room in Beverly Hills, California, in 2011, selling Dracula and Vampire branded wines. Operation of the Vampire Lounge was later transferred to the Blueblood Trust, which was created by Machat and continued to operate the lounge until it closed in June 2018. Plaintiff later licensed the Vampire mark to a long-time Machat friend and associate, Marita Jager Crandle, who opened her "New Orleans Vampire Café" in New Orleans in 2021, selling items with Plaintiff's brands.

At some point after February 2020, Plaintiff learned that a Romanian winery known as Viile Budureasca Srl was selling bottles of wine branded as "Dracula's Legacy" to an importer, Amavi Vinum, LLC. Amavi Vinum, in turn, sold the wine to a distributor, who then sold it to Defendant Dracula's Legacy, LLC, which operates "Dracula's Legacy" wine bars and bistro restaurants in St. Petersburg and Tampa, Florida. Defendants Elena Ramona Neamtu and Vasile Relu Neamtu manage the wine bars.

Plaintiff filed suit for trademark infringement against Dracula's Legacy, the Neamtu Defendants, Budureasca, and Amavi Vinum. Plaintiff dismissed the latter two defendants pursuant to settlement agreements. Defendants have asserted numerous affirmative defenses as well as two counterclaims against Plaintiff that

---

[1] As it appears Machat will of necessity be a witness in this case, the Court assumes that another attorney will represent Plaintiff at trial. *See* R. Regulating Fla. Bar. 4-3.7(a) (providing that a lawyer may not act as counsel at trial where he will be a necessary witness on behalf of the client).

seek cancellation of Plaintiff's registration for the trademarks. Count I seeks cancellation of the registration for Plaintiff's Dracula mark (Registration No. 3,319,536) based on allegations of fraud on the United States Patent and Trademark Office ("PTO"). Count II seeks cancellation of Plaintiff's Vampire mark (Registration No. 3,978,444) based on fraud on the PTO and abandonment. Plaintiff has moved for summary judgment on both counterclaims, on the corresponding affirmative defenses, and on certain other affirmative defenses.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A properly supported motion for summary judgment is not defeated by the existence of a factual dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Only the existence of a genuine issue of material fact will preclude summary judgment. *Id.*

The moving party bears the initial burden of showing that there are no genuine issues of material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing the existence of genuine issues of material fact. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true and all reasonable inferences must be drawn in the nonmoving party's favor. *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003).

## Analysis

Plaintiff, as the party asserting trademark infringement, bears the burden of proving (1) a valid registered trademark in use prior to the alleged infringing use, and (2) a likelihood of confusion on the part of customers as to the source, affiliation or sponsorship of the parties' products. *See Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010); *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). Defendants bear the burden of proof on their counterclaims for cancellation and on their affirmative defenses. *See, e.g., Sovereign Mil. Hosp. Ord. of Saint John v. Fla. Priory of the Knights Hosp.*, 702 F.3d 1279, 1289 (11th Cir. 2012); *Cumulus Media, Inc. v. Clear Channel Comm., Inc.*, 304 F.3d 1167, 1173-74 (11th Cir. 2002). Therefore, in the face of a properly supported motion, to avoid summary judgment, Defendants must point to evidence in the record from which a reasonable jury could find for them on each element of these counterclaims and defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that, to avoid summary judgment, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### *Fraud on the PTO*

Plaintiff moves for summary judgment on Defendants' counterclaims and Third and Fourth Affirmative Defenses, which seek to cancel Plaintiffs' trademark registrations for the Vampire and Dracula marks on the ground that they were obtained by fraud on the PTO by Machat, Plaintiff's principal.

Succeeding on a claim of fraud on the PTO requires that Defendants show that Machat "knowingly [made] false, material representations of fact in connection with [his] application for a registered mark." *Sovereign Mil. Hosp.*, 702 F.3d at 1289 (quoting *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008)). Fraud in this context requires "a purpose or intent to deceive the PTO in the application of the mark." *Id.* Thus, "[w]here a party challenges a trademark registration, 'the applicant's subjective belief' is at issue." *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490-CIV, 2011 WL 2174012, at *14 (S.D. Fla. June 2, 2011) (quoting *Stanfield v. Osborne Indus.*, 52 F.3d 867, 874 (10th Cir. 1995)); *see also In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009) ("Subjective intent to deceive, however difficult it may be to prove, is an indispensable element in the analysis."). In addition, fraud must be "proven 'to the hilt' with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." *In re Bose Corp.*, 580 F.3d at 1243 (quoting *Smith v. Olin Corp.*, 209 U.S.P.Q. 1033, 1044 (T.T.A.B. 1981)). Thus, the party seeking to show fraud on the PTO bears a heavy burden. *Sovereign Mil. Hosp.*, 702 F.3d at 1289.

In support of their fraud claim, Defendants point to Machat's statements in the process of applying for registration for the Dracula and Vampire marks that he, as the applicant:

> believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be

> likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive . . . .

Defendants assert that this statement was false for two reasons.

First, Defendants argue that at the time Machat made this statement to the PTO with respect to the Vampire mark, Machat was not personally using the Vampire mark in business. Rather, it was being used by Machat's company, TI Beverage, to operate the Vampire Lounge, and, Defendants contend, no Machat company, including TI Beverage, had a restaurant license from the state of California. TI Beverage, therefore, was not using the mark lawfully.[2]

Plaintiff argues that ownership rights in a mark may be acquired and maintained through use of the mark by a controlled licensee, such as, in this case, TI Beverage. Plaintiff appears to be correct. *See McCarthy on Trademarks and Unfair Competition* §§ 18:46, 18:51 (5th ed. 2025) (hereinafter "McCarthy"). "Controlled" in this context, does not necessarily require ownership or general control over the entity using the mark, but control over the quality of the goods or services provided under the mark. *See id.*; 15 U.S.C. § 1127 (defining "related company"); 15 U.S.C. § 1055 (use of mark by a related company inures to the benefit of the applicant or registrant, as long as the use is not deceptive); *Estate of Coll-*

---

[2] Defendants appear to link this (implied) representation of "lawfulness" to the idea of an "unlawful use" defense to infringement. But, as Defendants concede, this defense has not been recognized by the Eleventh Circuit. *See FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1086-88 (11th Cir. 2016) (affirming district court's rejection of unlawful use defense); *see also Hi-Tech Pharm. Inc. v. Dynamic Sports Nutrition, LLC,* No. 1:16-CV-00949, 2020 WL 10728951, at *1 (N.D. Ga. Jan. 10, 2020) (collecting cases); *McCarthy on Trademarks and Unfair Competition* § 31:58.50 (5th ed. 2025) (noting that a majority of court have declined to adopt the "unlawful use" defense for trademark infringement cases).

*Monge v. Inner Peace Movement*, 524 F.3d 1341, 1348 (D.C. Cir. 2008) (holding that the required control over the use of the mark as to the nature and quality of goods or serves "may include not only corporate control but also licensing agreements and other types of oversight").

Defendants have presented no evidence or argument that Machat exercised insufficient control over the goods or services provided at the Vampire Lounge by TI Beverage, under a license or otherwise, much less that he knew this was the case when he made the statements to the PTO. Further, as to the lawfulness of TI Beverage's use of the mark, Plaintiff has submitted evidence that TI Beverage was permitted to sell wine in the Vampire Lounge under a wine grower's license.[3] Defendants have provided no evidence that was not true or that Machat knew it was not true when making the statements to the PTO.

Defendants' second fraud charge relates to Machat's statement to the PTO that "to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce." Defendants argue this was false because numerous other entities use the terms "Dracula" and "Vampire" in the "hospitality space." Plaintiff replies that none of Defendants' exhibits, which

---

[3] Defendants similarly contend that a subsequent statement to the PTO by Machat in May 2021 that he was using the Vampire mark in commerce was false. They point to evidence that in December 2020 another company, CUZINS4, LLC, obtained "a Louisiana trademark registration for the mark 'THE NEW ORLEANS VAMPIRE CAFÉ.'" They argue that neither Plaintiff nor Machat controlled this company, and that a subsequent license agreement between Plaintiff and a company called Cuzins, LLC, "confirms that Plaintiff does not exclusively control its purported rights in Vampire." While, as discussed below, the nature and degree of control Plaintiff exercised over the goods and services of the New Orleans Vampire Café is not clear from the record, that is a far cry from a showing that Machat knew his statements to the PTO were knowingly false and made to deceive, as required to sustain Defendants' fraud contentions.

consist of lists of hits from trademark searches and a few registrations, show any entities selling Vampire or Dracula wine that have not ceased doing so based on Plaintiff's demands or any Vampire or Dracula bar outside of a licensee of Plaintiff "or a limited time pop-up use that Plaintiff was not aware of."

Based on the Court's review, Defendants' evidence does not support a finding that, when Machat made the challenged representation to the PTO, he was aware of another person or entity selling wines or operating bars or restaurants under the Dracula or Vampire marks, much less that he believed they had the right to do so, as required to make his representation to the PTO knowingly false.[4]

In sum, Defendants have presented no evidence, direct or circumstantial, sufficient to support a jury finding under the clear and convincing evidence standard that Machat made knowingly false representations and made them to deceive the PTO into accepting the registrations. *See IEP Techs., LLC v. KPM Analytics, Inc.*, 768 F. Supp. 3d 229, 240 (D. Mass. 2025) (explaining that for an inference from indirect or circumstantial evidence to support a fraud claim, the evidence must be clear and convincing); *see also Anderson,* 477 U.S. at 255-56 (holding that the summary judgment inquiry must be guided by the substantive evidentiary standard applicable at trial). Therefore, they cannot succeed on their cancellation counterclaim and fraud defenses.

---

[4] Perhaps Defendants' strongest item of evidence is a 2005 arbitration award resolving a complaint by Machat concerning another entity's use of "vampire"-related domain names. The award includes a finding that the other company had been selling wines with the vampire mark "as early as the 1980's." That award, however, was two years prior to the representation by Machat to the PTO cited by Defendants, and there is no evidence that Machat believed the other company involved in the arbitration had the right to use the mark.

Accordingly, summary judgment is granted on Count I of Defendants' counterclaims and on Count II to the extent that Count II is based on an allegation of fraud on the PTO, and on Defendants' Third and Fourth Affirmative Defenses.

### *Abandonment of the Vampire Mark*

Plaintiff moves for summary judgment on Count II of Defendants' counterclaim, which asserts that Plaintiff has lost its rights in its trademarks and registrations by abandonment, and on their Fifth Affirmative Defense, which raises the same point.

A mark is deemed abandoned if the owner (1) has ceased using the mark in commerce and (2) does not intend to resume its use. *Cumulus Media,* 304 F.3d at 1173-74. The intent not to resume use may be inferred from the circumstances. *Id.* at 1174 (citing 15 U.S.C. § 1127). Three years of consecutive non-use raises a rebuttable presumption of intent to abandon the mark. *Id.* The Eleventh Circuit has noted that courts have held the burden to prove abandonment is "strict" or "stringent" or "heavy." *See Cumulus Media*, 304 F.3d at 1175.[5]

---

[5] The Eleventh Circuit has not explicitly defined the "strict" burden in terms of clear and convincing evidence. This appears to be the majority rule, however, and a number of courts in this circuit have done so. *See Spliethoff Bevrachtingskantoor B.V. v. United Yacht Transp. LLC*, No. 21-61422-Civ-Scola, 2022 WL 17070554, at *5 (S.D. Fla. Nov. 17, 2022); *Navaka, LLC v. S. Pac. Elixir Co.*, No. 19-cv-81128-SINGHAL/Matthewman, 2020 WL 4601641, at *6 (S.D. Fla. Aug. 10, 2020); *see also* McCarthy § 17:21 ("Since abandonment is in the nature of a forfeiture and must be strictly proved, proof of the statutory period of nonuse sufficient to trigger the presumption must also be clear."). Plaintiff here has not argued that the correct standard is clear and convincing evidence, but that issue can be taken up at trial.

Defendants' counterclaim for cancellation and defense of abandonment relate to the Vampire mark for bar and restaurant services. Defendants contend that Machat closed the Vampire Lounge in 2017 or 2018, that at the time he had no intention of reopening it, and that the Vampire mark was not used again until Plaintiff entered a licensing agreement in 2022 with a Marita Jager Crandle, a friend of Machat, relating her New Orleans Vampire Café.

Plaintiff argues the mark has not been abandoned. Plaintiff has submitted evidence that the Vampire Lounge closed in the summer of 2018 because it needed more space than that provided by its then-expiring lease, and that Machat's intent was to reopen in a larger space.[6] Plaintiff asserts that in late 2020, Machat agreed with a longtime acquaintance Crandle to license the Vampire mark to her for a café she proposed opening in New Orleans, a project in which Machat assisted and which opened in January 2021 as the New Orleans Vampire Café. Plaintiff argues that the written license agreement in April 2022 merely "memorialized" a prior existing license.

As discussed above, use of a trademark by a controlled licensee inures to the benefit of the mark's owner. If Crandle properly used the mark as a licensee, with Plaintiff exercising the requisite control over the nature and quality of the goods and services as of January 2021, that would avoid the statutory presumption of abandonment. However, no documentary evidence has been submitted regarding

---

[6] In his deposition testimony, Machat also indicated that the bar was not making money. Defendants originally sought to file the entire deposition under seal. The Court denied this request, struck the deposition, and directed Defendants to re-file only the relevant portions of the deposition, which they never did. Accordingly, the Court has not considered the deposition for purposes of this motion.

the specific arrangements between Machat or Plaintiff and Crandle relating to the opening of Crandle's New Orleans Vampire Café, and the information on this issue in Machat's declaration is limited. Additionally, it appears that at some point prior to June 2018, management of the Vampire Lounge was transferred to the BlueBlood Trust, of which Machat was the creator, but not the trustee. The record discloses neither a written license nor any evidence as to Machat's control over the quality of goods and services provided by the Vampire Lounge under the trust's management.

For these reasons, the Court concludes that issues of fact remain, and Defendants' abandonment contentions are better considered on a more complete record at trial. Accordingly, the Court will deny summary judgment on this issue without prejudice to Plaintiff's ability to raise the issue at trial. *See, e.g., Navaka, LLC v. S. Pac. Elixir Co.*, No. 19-cv-81128-SINGHAL/Matthewman, 2020 WL 4601641, at *6 (S.D. Fla. Aug. 10, 2020) (holding that limited evidence submitted by the plaintiff regarding its use of the mark during the relevant period precluded summary judgment, notwithstanding the defendant's failure to point to evidence constituting "strict proof" of abandonment.).

Plaintiff's motion for summary judgment as to Count II of Defendants' counterclaim to the extent the counterclaim is based on abandonment, and as to Defendants' Fifth Affirmative Defense, is denied.

*Remaining Affirmative Defenses*

<u>First and Second Affirmative Defenses</u>

Defendants' First Affirmative Defense asserts that the complaint fails to state a claim on which relief may be granted. The Second Affirmative Defense asserts that Defendants have not infringed a valid enforceable trademark owned by Plaintiff. Plaintiff argues that these are not affirmative defenses because they merely assert that Plaintiff cannot prove the elements of a claim for relief. Plaintiff is correct that these are not proper affirmative defenses, but there is no need to grant summary judgment; the Court will instead simply treat these defenses as specific denials. *See Philpot v. MyArea Network, Inc.*, No. 8:20-cv-1239-VMC-TGW, 2021 WL 2649236, at *13 (M.D. Fla. June 28, 2021). Accordingly, Plaintiff's motion for summary judgment is denied as to these defenses.

<u>Seventh Affirmative Defense</u>

Plaintiff moves for summary judgment on Defendants' Seventh Affirmative Defense, which asserts that Plaintiff's infringement claims are barred by the doctrine of first sale. Under this doctrine, once a trademark owner "consents to the sale of particular copies . . . of his work, he may not thereafter exercise the distribution right with respect to such copies . . . ." *Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1447 (11th Cir. 1998) (quoting M. Nimmer and D. Nimmer, *Nimmer on Copyright* § 8.12[B][1] (1997)). Essentially, a trademark owner relinquishes the ability to prevent others from using or selling the items on which the trademark is affixed because the owner's "'first sale' constitutes an implicit authorization for purchasers of those products to use them for any legitimate

purpose . . . ." *Ford Motor Co. v. O.E. Whell Distribs., LLC*, 868 F. Supp. 2d 1350, 1369 (M.D. Fla. 2012) (internal citations omitted). Thus, "[o]nce a trademark owner sells his product, the buyer ordinarily may resell the product under the original mark without incurring any trademark liability." *NEC Electronics v. CAL Circuit ABCO,* 810 F.2d 1506, 1509 (9th Cir. 1987).

Plaintiff contends that the first sale doctrine does not apply here. Plaintiff points to the fact that there were no authorized sales of the wine branded with Plaintiff's mark and that Plaintiff did not willingly sell any of its products to Defendant. Instead, the winery and importer used a mark similar to Plaintiff's without permission in connection with the wine Defendants purchased from them for re-sale.

Defendants point to settlements Plaintiff entered with Viile Budureasca and Amavi Vinum, formerly defendants in this case, and contend these agreements somehow retroactively authorize or legitimize those entities' sales to Defendants of wine with allegedly infringing marks. But the settlement agreements simply resolve Plaintiff's infringement claims against the two former defendants in return for a monetary payment and an agreement to cease selling wines with the allegedly infringing similar marks. They do not purport to retroactively authorize the original sales by Budureasca and Amavi Vinum so as to bring Defendants' sales within the first sale doctrine. Accordingly, Plaintiff is entitled to summary judgment on Defendants' Seventh Affirmative Defense.

Eighth Affirmative Defense

Defendants in their Eighth Affirmative Defense assert that their use of the marks is protected by the doctrine of aesthetic functionality. The concept of functionality precludes trade dress infringement claims where the feature alleged to have been infringed is "functional."[7] "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1202-03 (11th Cir. 2004) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995)).

A feature is deemed to be functional when it is "essential to the use or purpose of the article or if it affects the cost or quality of the article," or when denying competitors the use of the feature "would put competitors at a significant non-reputation-related disadvantage." *Id.* at 1203 (quoting *TrafFix Devices, Inc. v Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001)). The latter test is typically used where the alleged functionality is aesthetic rather than purely utilitarian. *Id.* at 1203. The "ultimate test of aesthetic functionality" is "whether the recognition of trademark rights would significantly hinder competition." *Qualitex*, 514 U.S. at 170 (quoting Restatement (Third) of Unfair Competition § 17, comment c); Restatement

---

[7] "The term 'trade dress' refers to the appearance of a product when that appearance is used to identify the producer." *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC,* 369 F.3d 1197, 1202 (11th Cir. 2004) (quoting *Publ'ns Int'l, Ltd. v. Landoll, Inc.,* 164 F.3d 337, 338 (7th Cir. 1998)). "'Trade [d]ress' involves the total image of a product and may include features such as size, shape, color . . . , texture, graphics, or even particular sales techniques." *Id.* (quoting *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1535 (11th Cir. 1986)).

(Third) of Unfair Competition § 17, comment e ("A design is functional because of its aesthetic value only if it confers a significant benefit that cannot practically be duplicated by the use of alternative designs.").

Plaintiff argues that the aesthetic functionality doctrine does not apply here because Plaintiff's issue is not with Defendants' using vampire or Dracula memorabilia throughout Defendants' wine bars, but rather, their use of "Dracula" in the name of the bars and in signage and marketing materials. Plaintiff contends that the crux of the case is Defendants' use of "Dracula" as a trademark and that "[t]his is not a trade-dress case." But Plaintiff's second amended complaint alleges: "the décor and thematic elements (i.e., *trade dress*) found at Defendants' wine bar, such as its frequent and prominent use of vampire signs and references to Dracula, further infringe upon Plaintiff's Vampire Family marks." (emphasis supplied). Defendants' response points out the inconsistency, but Plaintiff's reply fails to address it.

Plaintiff may be correct on the limited scope of aesthetic functionality. It may also be that Plaintiff will formally withdraw its allegation regarding trade dress. At this juncture, in light of Plaintiff's allegation and the amorphous contours of the "aesthetic functionality" concept, the Court will deny summary judgment and revisit the issue at the pretrial conference and trial.

<u>Ninth Affirmative Defense</u>

Defendants' Ninth Affirmative Defense asserts that their use of the marks at issue is protected under the doctrine of fair use. 15 U.S.C. § 1115(b)(4) provides that it is a defense to an infringement claim that the defendant's use of the "name,

term, or device charged to be an infringement is a use, otherwise than as a mark . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin . . ..." "The 'fair-use' defense, in essence, forbids a trademark registrant to appropriate a descriptive term for [its] exclusive use and so prevent others from accurately describing a characteristic of their goods." *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1363 (11th Cir. 2019) (quoting *Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006)).

To succeed on a fair use defense an alleged infringer must establish that it used the infringing term (1) other than as a trademark, (2) in a descriptive sense, and (3) in good faith. *Id.* To use a term in a descriptive sense is to use it to identify a "characteristic or quality of an article or service, as, for example, its color, odor, function, dimensions, or ingredients." *Id.* (quoting *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1185 (5th Cir. 1980)). In determining whether a defendant's use of a term is as a trademark or merely descriptive, courts look to, among other things, whether the term is being used as an attention-grabbing device and at the type style, size, and visual placement and prominence of the challenged words. *See* McCarthy § 1146.

Plaintiff argues that Defendants use "Dracula's Legacy" in their signage and marketing materials as a trademark and not to describe goods or services. Plaintiff points out that the "Dracula" portion of the bar's logo is the dominant portion and that the word is a noun, not an adjective (which presumably would more likely be descriptive). Plaintiff also notes that Defendants have a pending application with

the PTO for "Dracula's Legacy" as a trademark, undermining any argument that they are not using the term as a trademark.

Defendants respond that the bars' name "refers to the legacy of Dracula," and "demonstrates the historical figure on which Defendants have built their legacy." These assertions may be true, but Defendants fail to explain their relevance to the elements a fair use defense or how "Dracula's Legacy" is being used only to describe their product or service and not as a trademark. Examples of terms held to be merely descriptive include "food center" (for a grocery store), "golden" (describing a children's writing slate) "hard candy" (for a shade of cosmetic), and "ride hard" (for motorcycles). *See* McCarthy § 1148. "Dracula's Legacy" does not on first blush appear to be similar to these or other examples in the case law the Court has reviewed.

On the other hand, courts have held that the use of the name of an historical figure can be descriptive where the product in question relates to the historical figure. For example, in *Hebrew Univ. of Jerusalem v. DealzEpic*, No. 21 CV 5492, 2022 WL 3026934 (N.D. Ill. Aug. 1, 2022), the court held that using "Albert Einstein" in connection with the sale of mousepads bearing the image of the famous scientist and mathematician constituted a descriptive use. In *Rin Tin Tin, Inc. v. First Look Studios, Inc.,* 671 F. Supp. 2d 893 (S.D. Tex. 2009), the court held that the defendants' use of "Rin Tin Tin" in the title of a movie about the life of the historical dog Rin Tin Tin constituted a descriptive use.

In this case, Romanian history, Dracula/Vlad the Impaler, and vampires are integral thematic elements of Defendants' wine bars. As noted above, Plaintiff's

summary judgment papers assert that Defendants are free to "deck their bars out with vampire or Dracula memorabilia." If so, then the term "Dracula's Legacy" is arguably descriptive of Defendants' product, i.e., a Dracula and vampire-themed bar. The Court accordingly will deny summary judgment as to this defense but Plaintiff may raise the issue again at the pretrial conference and at trial.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

1. "Vampire Family Brands, LLC's Motion for Partial Summary Judgment and Incorporated Memorandum of Law" (Doc. 89) is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 30th day of September, 2025.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**